### The PILLSBURY COMPANY, Appellant–Defendant,

v.

### Rebecca OSBORNE, Appellee–Plaintiff.

### No. 93A02–0211–EX–924.

Court of Appeals of Indiana.

Aug. 27, 2003.

Michael Patrick Dugan, Douglas W. Meagher, Riley, Bennett & Egloff, LLP, Indianapolis, IN, Attorneys for Appellant.

Bart Colomb, New Albany, IN, Attorney for Appellee.

## OPINION

MAY, Judge.

The Pillsbury Company ("Pillsbury") appeals the decision of the Indiana Worker's Compensation Board ("the Board") finding Rebecca Osborne permanently and totally disabled. Pillsbury raises five issues, which we expand and restate as:

1. Whether the Board's findings of fact have sufficient evidentiary support;

2. Whether the Board improperly disregarded evidence concerning Osborne's pre-existing impairments;

3. Whether Osborne became disabled as of December 1998 rather than October 1997;

4. Whether the Board's findings of fact support its conclusions;

5. Whether the Board was required to apportion the award because Osborne had pre-existing impairments; and

6. Whether the Board's award of all statutory medical expenses requires clarification.

We affirm and remand with instructions.

## FACTS[1] AND PROCEDURAL HISTORY

Osborne was employed by Pillsbury when she injured her neck on October 30, 1997. Osborne was shutting a trap door on an overhead hopper when she "looked up and to [her] left, and something popped in [her] neck." (App. at 103.) Osborne left work early that day because her neck was "hurting real bad." (*Id.* at 105.) She testified "I couldn't move my head at all to turn my head." (*Id.*) The next day she saw the company doctor, Edward Bell. Dr. Bell put Osborne on light duty for two weeks and prescribed medication for her.

---

1. We remind Pillsbury that the facts in its brief are to be stated "in accordance with the standard of review appropriate to the judgment or order being appealed." Ind. Appellate Rule 46(6)(b). Under this standard of review, we "consider only the evidence most favorable to the award, including any and all reasonable inferences flowing therefrom." *Shultz Timber v. Morrison,* 751 N.E.2d 834, 836 (Ind.Ct.App.2001), *trans. denied* 761 N.E.2d 425 (Ind.2001).

In December, when Osborne continued to have severe headaches, Dr. Bell referred her to an orthopedic surgeon, Dr. Thomas Lehmann. Dr. Lehmann first examined Osborne for this problem on January 6, 1998. Osborne continued to work at Pillsbury until March 1998. After various treatments, none of which were entirely successful, Dr. Lehmann performed an anterior cervical discectomy and fusion at the C6–7 level with instrumentation on April 27, 1998. Osborne's headaches lessened after that surgery.[2]

Dr. Lehmann released Osborne to return to work without restrictions on September 14, 1998. Osborne stated Dr. Lehmann had wanted to include restrictions at that time but she told him "I wouldn't be able to work if I had restrictions[.]" (*Id.* at 75.) Osborne returned to Dr. Lehmann on October 20, 1998, complaining of increased headaches and pain. Dr. Lehmann referred her to a neurologist, Dr. James McKiernan. Dr. McKiernan prescribed medication, which was ineffective in relieving the headaches and pain.

Osborne returned to Dr. Lehmann on December 22, 1998, because "my head had been hurting so bad I couldn't hardly stand it." (*Id.* at 76.) Dr. Lehmann's records indicate Osborne "does not feel like she can work with her pain" and "is adamant about her inability to work." (*Id.* at 258.) He imposed permanent restrictions of no overhead work (above shoulder height) and no lifting of more than twenty pounds. When Osborne informed Pillsbury of these restrictions, she was told Pillsbury did not have a job for her. Dr. Lehmann indicated at that time he could do nothing more for Osborne. His functional impairment rating of Osborne was

"an additional 20% impairment of her body as a whole as a result of the central protrusion of the disc at C6–7 and the bulging disc at C4–5." (*Id.* at 258.) Osborne has not worked at Pillsbury or elsewhere since December 22, 1998.

Osborne filed a claim with the Board on March 12, 1999. She saw additional specialists in connection with her claim including Sally Moore, a vocational rehabilitation consultant, who filed a report on October 13, 1999; Dr. James Murphy, a pain specialist, who first saw Osborne on October 27, 1999; Dr. Richard T. Holt, who recommended surgery at the C3–4 level on November 16, 1999; and Dr. Luca Conte, a vocational rehabilitation . counselor, who filed a report on April 11, 2000.

A hearing before Single Hearing Member William Howell was held April 20, 2000. On March 7, 2001, Howell issued an order finding Osborne was permanently totally disabled. Pillsbury filed for review by the Full Board. A hearing was held June 25, 2002, and the Board issued an order on October 17, 2002 affirming Howell's decision.

The order contained sixteen findings of fact and the following three conclusions:

1. Osborne sustained a cervical spinal injury arising out of and in the course of her employment with Defendant on October 30, 1997.

2. Various physicians, including Osborne's treating physician, Dr. Lehmann, and Defendant's evaluating physician, Dr. McKiernan, have concluded her chronic pain and muscle contractions are related to her neck injury and related to her work at Pillsbury.

---

**2.** This was Osborne's fourth neck surgery. Dr. Lehmann had performed an anterior cervical discectomy and fusion of C5–6 on October 24, 1988 and Dr. Erdogan Atasoy performed bilateral scalenectomies to treat Osborne's thoracic outlet syndrome in October 1995 and April 1997.

3. Osborne's neck injury and her resulting chronic pain renders her permanently totally disabled.

(*Id.* at 6.)

## STANDARD OF REVIEW

 Upon appeal from a finding of the Worker's Compensation Board, we are bound by the Board's findings of fact and may not disturb its determination unless the evidence is undisputed and leads undeniably to a contrary conclusion. It is the duty of the Board, as the trier of fact, to make findings that reveal its analysis of the evidence and are specific enough to permit intelligent review of its decision. In evaluating a decision of the Board on appeal, we employ a two-tiered standard of review. First, we review the record to determine if there is any competent evidence of probative value to support the Board's findings. We then examine the findings to see if they are sufficient to support the decision. We will not reweigh the evidence or assess witness credibility. We consider only the evidence most favorable to the award, including any and all reasonable inferences flowing therefrom. Thus, to prevail in this appeal, [Pillsbury] is required to show that there is no probative evidence from which the Board might reasonably conclude as it did.

*Shultz Timber v. Morrison,* 751 N.E.2d 834, 836 (Ind.Ct.App.2001), *trans. denied* 761 N.E.2d 425 (Ind.2001) (citations omitted).

## DISCUSSION AND DECISION

1. *Evidentiary Support for Findings of Fact*

Pillsbury contends Findings No. 3, 9, 10, 11, 12 and 16 are not supported by the evidence. In reviewing these findings, we seek to determine if there is competent evidence of probative value to support the Board's findings. *Id.*

A. *Finding No. 3*

 The Board's third finding is: "Osborne's injury resulted in a C6–7 disc herniation, disc derangement at C3–4, C4–5, C5–6." (App. at 4.) This finding is supported by evidence.

Dr. Lehmann stated that Osborne's "[h]erniated nucleus pulposus at C6–7 and degenerated disc at C4–5" were the direct result of the October 1997 injury. (*Id.* at 176–77.) Dr. Holt's notes indicated Osborne had a worker's compensation injury in October 1997 and "symptoms have been present since." (*Id.* at 297.) He concluded based on an MRI done on November 18, 1999 that Osborne has a "cervical herniated disc at C3–4." (*Id.* at 298.)

B. *Finding No. 9*

 The Board's ninth finding provides: Dr. Lehmann diagnosed herniated nucleus pulposus C6–7 and degenerative disc disease at C4–5 which was causally related to Osborne's work related injury on October 30, 1997. Dr. Lehmann assessed Osborne's permanent impairment at 20% to the body as a whole. Dr. Lehmann restricted Osborne from all overhead work and lifting above shoulder height. Also, Dr. Lehmann imposed a lifting restriction of 20 pounds.

(*Id.* at 5.)

Pillsbury argues this finding is misleading because it incorrectly states Osborne's level of impairment. Because Dr. Lehmann indicated Osborne had "an *additional* 20% impairment of her body" as a result of her October 1997 injury, (*id.* at 258) (emphasis supplied), Pillsbury argues Osborne had "physical impairment beyond that caused by the work injury." (Br. of Appellant at 16.)

Impairment in the context of worker's compensation refers to "a loss of a physical function." *White v. Woolery Stone Co., Inc.*, 181 Ind.App. 532, 396 N.E.2d 137, 139 (1979). Osborne had various complaints of pain before and after her prior neck surgeries. However, there is no evidence those complaints reflected her impairment. In fact, Osborne usually worked twelve to sixteen hours of overtime each week while at Pillsbury. The Board could have reasonably inferred from this information that Osborne had no pre-injury impairments or that they were negligible. There is evidence to support this finding and the uncontradicted evidence does not unerringly lead to a contrary finding.

## C. *Finding No. 10*

█ The Board's tenth finding is: "Dr. Lehmann recommended that Osborne apply for Social Security Disability because she could not work. He stated that Osborne's complaints of pain were genuine and that is it possible for a post-surgical patient to have continued complaints of pain with no objective evidence of recurrent herniation or neurological deficit." (App. at 5.)

Pillsbury attacks the implication of the first sentence of this finding. Although conceding Dr. Lehmann and Osborne discussed whether Osborne should apply for Social Security Benefits in December 1998, Pillsbury contends the discussion occurred because Osborne insisted she could not work, not because Dr. Lehmann believed she could not work. However, Pillsbury asserts, the fact that Dr. Lehmann discussed Social Security benefits with Osborne does not necessarily imply he believed she could not work.

Dr. Lehmann testified there was no "objective medical reason" why Osborne could not return to work but added that Osborne's "complaints of pain ... would make it difficult" for her to return to work. (*Id.* at 184.) Dr. Conte, who reviewed Dr. Lehmann's records as part of his vocational evaluation of Osborne, noted that when a patient says she cannot work, a physician will "typically" recommend the patient seek Social Security disability benefits. (*Id.* at 237.) The following exchange then occurred:

> [Counsel for Osborne]: All right. Assuming that he did make such a recommendation [that Osborne seek Social Security disability benefits], do you know why Dr. Lehmann would make that type of recommendation if he thought Ms. Osborne was capable of working?
>
> [Dr. Conte]: Quite simply I do the same thing. Anyone that comes to me and says, "I can't work anymore," then I say, "Well, here are the disability benefits that you're entitled to," and send them off to whatever source that they feel is appropriate to apply to.

(*Id.* at 237–38.) Dr. Conte's testimony indicates a physician may advise a patient to apply for disability benefits for reasons other than his own belief the patient is unable to work. This finding is supported by evidence.

## D. *Finding No. 11*

█ The Board's eleventh finding is: "Osborne filed the medical records of Dr. Richard T. Holt on February 18, 2000. Dr. Holt's records reflect that Osborne currently suffers from a disc herniation at the C3–4 level. Dr. Holt stated that Osborne should not return to production work." (*Id.* at 5.) Pillsbury takes issue with the last sentence of this finding as being incomplete and misleading.

Dr. Holt's complete statement was: "In my opinion, she will never return to a *heavy manual laboring* job such as a production worker at Pillsbury." (*Id.* at 298) (emphasis supplied). Finding No. 11 is an

incomplete and misleading characterization of what Dr. Holt said. However, Dr. Conte testified that Dr. Holt "advised against repetitive and production work," adding "that certainly makes sense given [Osborne's] history and surgical treatment." (*Id.* at 240.) Moore indicated that despite Dr. Lehmann's restrictions, Osborne would be able to perform "unskilled sedentary and unskilled light work," but advised against Osborne performing assembly line work. (*Id.* at 147.)

Although this finding misstates Dr. Holt's conclusion, other evidence supports the recommendation that Osborne not return to production work.

### E. *Finding No. 12*

▇▇▇ The Board's twelfth finding is: "Defendant filed the medical records of Dr. James McKiernan on April 19, 2000. Dr. McKiernan diagnosed muscle contraction headaches/chronic daily headaches which he indicated were causally related to Osborne's neck problems. Dr. McKiernan prescribed Buspar for the headaches." (*Id.* at 5.)

Pillsbury argues that because Osborne had an extensive history of neck problems predating October 1997, "the Full Board could not reasonably draw an inference . . . that the headaches were connected solely to" the October 1997 injury. (Br. of Appellant at 17.) Dr. McKiernan's report states Osborne's "headaches are most consistent with so-called muscle contraction headaches or chronic daily headaches. Likely this is related to her past neck problems." (App. at 305.) Pillsbury argues "past neck problems" refers to Osborne's neck problems before October 1997.

Dr. Lehmann's records indicate Osborne had pain in the top of her head prior to her surgery in 1998. The records note "she had no headache from then until October 30, 1997," although she "still had pain in her neck and shoulders." (*Id.* at 254.) Osborne's testimony also indicates her headaches began "the morning after the accident." (*Id.* at 76.) As a result of this evidence, the Board could have reasonably inferred that Osborne's headaches were related solely to the October 1997 injury. There is evidence to support this finding.

### F. *Finding No. 16*

▇▇▇ The Board's sixteenth finding is: "Dr. Conte acknowledged that Osborne returned to work after each of her four surgeries and that overwork led to an increase in her symptoms that eventually caused her to discontinue working on December 19, 1998." (*Id.* at 6.)

Pillsbury argues this finding "wrongly suggests that Dr. Conte believed that overwork led to Employee Osborne's inability to work beginning in December 19, 1998, when in fact he believed that Employee Osborne could work normal hours in a less strenuous position." (Br. of Appellant at 17–18.) This argument fails at the outset because a belief that overwork may have increased Osborne's symptoms is not, as Pillsbury suggests, necessarily inconsistent with a belief that Osborne could work normal hours in a less strenuous position.

Dr. Conte's report indicates "a probable 'overwork' situation rather than a change in medical status" caused Osborne to stop working. (App. at 248.) During his deposition, Dr. Conte stated:

> I believe anyone in this room who worked 60 [3] hours of overtime in a physi-

---

**3.** Osborne worked 62 hours of overtime during the week of December 4, 1998, her third-to-last week before stopping work.

cally demanding repetitive job probably would have had some difficulty with it ... So it's, I think, pretty reasonable to conclude that there are going to be some subjective complaints [of pain] as a result of that.

(*Id.* at 237) (footnote added). Dr. Conte also testified that Osborne "has a capacity to perform work in a wide variety of ... lighter and sedentary jobs." (*Id.* at 221.) This finding is supported by evidence and is not internally contradictory.

### 2. *Evidence of Pre–Existing Impairments*

■ Pillsbury argues the Board erred when it failed to consider uncontradicted evidence about Osborne's previous surgeries and the effect of those surgeries on her current impairment. The evidence indicates Osborne complained of pain after her previous surgeries but her pain had not prevented her from working. Only after the October 1997 injury, the April 1998 surgery, and two months at work did Osborne's pain increase to a level that prevented her from working. The Board, in its role as fact-finder, did not err in giving less weight to or disregarding evidence regarding Osborne's previous surgeries and the effect of those surgeries.

### 3. *Date of Award*

■ The Hearing Member's award, which was affirmed by the Board, dates Osborne's permanent total disability to October 1997. This is, as Pillsbury notes, clearly erroneous. Although Osborne was injured in October 1997, her injury did not progress to permanent total disability until December 1998. *See Bogdon v. Ramada Inn, Inc.,* 415 N.E.2d 767, 770 (Ind.Ct.App. 1981) (holding time for notice to be given

to employer begins to run when disability, not injury, occurs). There, we noted "[n]ot all injuries are subject to immediate detection or sudden disability; some are progressive in nature ... The fact that [an employee] continues to work and refuses to succumb to aches and pains until his condition progresses to a state of disability is no reason to penalize him." Accordingly, we remand for correction of this error.

### 4. *Support for Conclusions*

■ Pillsbury argues the Board's second conclusion of law lacks factual basis, contradicts a factual finding, and impermissibly ignores evidence, and that "[t]his flawed conclusion necessarily undermines the third conclusion of law" that Osborne was totally permanently disabled. (Br. of Appellant at 21.) After determining that the findings are supported by sufficient evidence, we examine the findings to see if they are sufficient to support the decision. *Shultz Timber,* 751 N.E.2d at 836.

The Board's second conclusion is: "Various physicians, including Osborne's treating physician, Dr. Lehmann, and Defendant's evaluating physician, Dr. McKiernan, have concluded her chronic pain and muscle contractions are related to her neck injury and related to her work at Pillsbury." (App. at 6.)

While the Board's conclusion is not a model of drafting precision,[4] the following findings support the Board's conclusion that Osborne's chronic pain and muscle contractions are related to her neck injury and to her work at Pillsbury. Finding No. 12 indicates Osborne's contraction headaches and chronic daily headaches are related to her neck problems. Finding No. 9 indicates Osborne's neck injury resulted from her work at Pillsbury. Finding No. 8

---

**4.** For example, the phrase "various physicians, including [Dr. Lehmann and Dr. McKiernan]" indicates physicians in addition to Drs. Lehmann and McKiernan contributed to this conclusion. The record does not so reflect.

indicates she had surgery for her neck injury and that her headaches continued after the surgery. These findings are sufficient to support Conclusion No. 2.

Pillsbury contends this conclusion contradicts Finding No. 14, which states: "Due to Osborne's chronic pain syndrome from her multiple surgeries, Ms. Moore is of the opinion that [Osborne] is now permanently and totally disabled. Ms. Moore stated that Osborne was credible and that her complaints of pain are genuine." (*Id.* at 6.) Pillsbury asserts Finding No. 14 and Conclusion No. 2 "cannot be reconciled." (Br. of Appellant at 20.) However, Finding No. 14 does not indicate the Board found Osborne's multiple neck surgeries resulted in chronic pain and disability. Rather the Board found that Moore based her conclusion of permanent total disability on Osborne's chronic pain from multiple surgeries. This finding is not inconsistent with Conclusion No. 2. *See Ellis v. Hubbell Metals, Inc.,* 174 Ind.App. 86, 89, 366 N.E.2d 207, 209 (1977) (board's acknowledgement of plaintiff's testimony that he injured his back while performing his job in the normal manner was not inconsistent with board's finding that any temporary total disability and medical expense incurred by plaintiff were due to causes unrelated to his employment).

Conclusion No. 3 states: "Osborne's neck injury and her resulting chronic pain renders her permanently totally disabled." (App. at 6.) Finding No. 14 and Conclusion No. 2 support this conclusion.

### 5. *Necessity of Apportionment*

■ Pillsbury argues the Board erred as a matter of law when it failed to apportion the award of total permanent disability between Osborne's pre-existing impairments and her work-injury impairments.

Ind.Code § 22–3–3–12 controls when apportionment between pre-existing impair-

ments and work-injury impairments is required:

If an employee has sustained a permanent injury either in another employment, or from other cause or causes than the employment in which he received a subsequent permanent injury by accident, such as specified in section 31, he shall be entitled to compensation for the subsequent permanent injury in the same amount as if the previous injury had not occurred: Provided, however, [t]hat if the permanent injury for which compensation is claimed, results only in the aggravation or increase of a previously sustained permanent injury or physical condition, regardless of the source or cause of such previously sustained injury or physical condition, the board shall determine the extent of the previously sustained permanent injury or physical condition, as well as the extent of the aggravation or increase resulting from the subsequent permanent injury, and shall award compensation only for that part of such injury, or physical condition resulting from the subsequent permanent injury. Provided further, however, [t]hat amputation of any part of the body or loss of any or all of the vision of one or both eyes shall be considered as a permanent injury or physical condition.

In *U.S. Steel Corp. v. Spencer,* 655 N.E.2d 1243, 1248 (Ind.Ct.App.1995), *trans. denied,* we held that apportionment is not always required when the employee has a pre-existing condition. We noted the statute describes three scenarios regarding pre-existing and work-injury impairments: 1) work-injury impairments that merely combine with pre-existing conditions to result in disability; 2) work-injury impairments that are merely aggravations of pre-existing conditions; and 3) work-injury impairments which occur, per-

haps to physically imperfect employees, solely from events at the current employer's workplace. *Id.* The first two scenarios result in application of the apportionment statute while the third does not. *Id.*

Although Osborne may have been more susceptible to neck injuries than a physically "perfect" employee, her pre-existing conditions were not significant impairments. Finding No. 13 notes Osborne's "very consistent work history" despite four surgeries. (App. at 6.) Finding No. 15 indicates Osborne has no significant gaps in her employment history and "has a good work record." (*Id.*) Those findings and Osborne's testimony indicate she was able to work without restriction before the October 1997 injury, despite having had three neck surgeries. Osborne also worked between twelve and sixteen hours of overtime each week while employed with Pillsbury. Only after the October 1997 injury and subsequent surgery did Osborne become unable to work. See *Spencer,* 655 N.E.2d at 1248 (that Spencer was able to work at "hard arduous labor" for ten years following his previous injury supported the conclusion that the current injury and not a pre-existing impairment rendered him disabled).

Neither the Board's findings nor its conclusions indicate the Board found Osborne's total permanent disability was due to a pre-existing impairment. Because the evidence in the record does not unerringly lead to the conclusion that Osborne had a pre-existing impairment, the Board could have reasonably determined Osborne's impairments were related solely to the October 1997 injury. The Board was not required to apportion the award.

### 6. *Clarification of Medical Expenses Award*

The parties agree that the Board's award of "all statutory medical expenses,"

(App. at 29), requires remand for clarification as to which medical expenses are included. We agree.

## CONCLUSION

Findings No. 3, 9, 10, 12 and 16 are supported by sufficient evidence. Although Finding No. 11 misstates Dr. Holt's conclusions, other evidence supports the recommendation attributed to him. We remand for clarification of which medical expenses are included in the Board's award and a correction of the date of the award. We affirm the Board's conclusion and its decision not to apportion the award.

Affirmed and remanded with instructions.

MATHIAS and KIRSCH, JJ., concur.